IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FULTZ & SON, INC., | ) | CASE NO. 3:17 CV 53 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| BROWNING-FERRIS INDUSTRIES | ) | |
| OF OHIO, INC., | ) | MEMORANDUM OPINION |
| | ) | |
| Defendant. | ) | |

This matter is before the Court on Browning-Ferris Industries of Ohio, Inc.'s Motion for Summary Judgment as to Plaintiff's Complaint. (ECF # 52). The motion has been fully briefed and is ready for disposition. (ECF # 57, 58, 63, 64). Having considered all of the arguments of the parties, and having reviewed the undisputed facts and applicable law, the Court finds that Defendant's motion should be GRANTED in part and DENIED in part.

## Facts[1]

Fultz & Son, Inc. ("FSI"), is a small commercial and residential waste hauler. On February 13, 2015, FSI entered into an Asset Purchase Agreement with Browning-Ferris Industries of Ohio, Inc. ("Browning") whereby Browning would purchase FSI's hauling routes for industrial, residential, and commercial solid waste, and recyclable waste for $8.5 million. (ECF #52 at 3). The Asset Purchase Agreement incorporated several sub-agreements, including a Supply Agreement. The Supply Agreement outlined a five-year contract during which Browning would deliver to FSI "(1) all roll-off loads that contain C&D Waste within the Territory, (2) the waste from certain roll-off customers that produce dry industrial waste roll-off loads[2] to be negotiated by the parties on a case-by-case basis, (3) all old corrugated cardboard ("OCC") collected within the Territory, and (4) all single-stream recyclables ("SSR") collected within the Territory. (ECF # 1-1, Recital E). The Supply Agreement defined C & D Waste as "any and all waste that is not Unacceptable Waste, resulting from the construction, remodeling, clean-up and demolition operations on houses, commercial and industrial buildings and other structures." (ECF #1-1, Section 1.2). "Unacceptable Waste" is defined as "any and all Municipal Solid Waste or other wastes that the Landfill or the MRF Facility. . . is not authorized to accept for disposal pursuant to its permits, licenses and/or the applicable regulations of the Ohio EPA . . . .). (ECF #1-1, Section 1.6). Following the purchase of its assets by Browning, FSI's revenue was to

---

[1] Except as otherwise cited, the factual summary is based on the parties' statements of fact. Those material facts which are controverted and supported by deposition testimony, affidavit, or other evidence are stated in the light most favorable to the non-moving party.

[2] "Roll-off" refers to an open-top rectangular waste container holding 20, 30, or 40 maximum cubic yards of waste material. (ECF #52.)

be derived from (1) "tipping fees" from Browning for the unloading or "tipping" of C&D roll-off boxes under the terms set forth in the Supply Agreement, and (2) the revenues from the resale of C&D, OCC, and SSR on the commodities market.

Disputes between the parties surfaced almost immediately after the agreements were executed. Among other things, FSI claimed that Browning did not deliver all of the C&D roll-off boxes that it was required to send FSI under the terms of the Supply Agreement. Browning countered that FSI had improperly raised the SSR processing fees. The disagreements escalated over the first half of the year, and by August 1, FSI stopped accepting SSR loads from Browning. (ECF #1, ¶54). Browning took the position that FSI's failure to accept SSR loads was a material breach of the Supply Agreement, and stopped delivering OCC loads the same month. (ECF #1, ¶ 56). The FSI facility ceased operations and began liquidation on August 21, 2015. (ECF #1, ¶57).

On January 6, 2017, FSI filed a two-count Complaint against Browning in the Northern District of Ohio. Count One of the Complaint alleges that Browning breached the Supply Agreement and Count Two alleged Browning fraudulently induced FSI to enter into the Supply Agreement. (ECF #1). Plaintiff now concedes that there is insufficient evidence to maintain its claim of fraud, and has withdrawn that claim. (ECF #57, fn. 8). Thus, Plaintiff's only claim remaining is for breach of contract.

Along with its Answer, Defendant, Browning filed a Counterclaim against FSI, as well as a Third-Party Complaint against its owner Larry A. Fultz and against Kendra Fultz. (ECF #14). Defendant, Browning asserts claims for: (1) Breach of the Asset Purchase Agreement and Supply Agreement against FSI and Larry Fultz; (2) Civil Conversion against FSI; (3) Contractual

Indemnity against FSI and Larry Fultz; (4) Unjust Enrichment against FSI; and, (5) Breach of Noncompetition and Nonsolicitation Agreements against FSI, Larry Fultz, and Kendra Fultz. Browning also seeks declaratory relief against FSI, and Larry and Kendra Fultz. (ECf #14). Plaintiff FSI filed a Partial Motion to dismiss Count 4 of the Counterclaim (ECF #25), which was denied. (ECF #25, 31).

This case is now before the Court on Defendant, Browning's Motion for summary judgment as to plaintiff's complaint. Browning argues that FSI's only alleged damages are precluded by the terms of the Asset Purchase Agreement, and are otherwise not viable because they are not reasonably certain and have not been causally tied to Browning's alleged breach of the Supply Agreement. (ECF #52).

## Summary Judgment Standard

Summary judgment is appropriate when the court is satisfied "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The burden of showing the absence of any such "genuine issue" rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citing FED. R. CIV. P. 56(c)). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine"

-4-

requires consideration of the applicable evidentiary standards. The court will view the summary judgment motion in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of their case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). Moreover, if the evidence presented is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citations omitted). In most civil cases involving summary judgment, the court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252. However, if the non-moving party faces a heightened burden of proof, such as clear and convincing evidence, it must show that it can produce evidence which, if believed, will meet the higher standard. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

Once the moving party has satisfied its burden of proof, the burden then shifts to the non-mover. The non-moving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995). In lieu of presenting evidence, Fed. R. Civ. P. 56(c) also allows that a party may show that the opposing party's evidence does "not establish the presence of a genuine dispute" or that the adverse party "cannot produce admissible evidence to

support the fact."

According to Fed. R. Civ. P. 56(e),

[i]f a party fails to properly support an assertion of fact, or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

(1) give an opportunity to properly support or address the fact;

(2) consider the fact undisputed for purposes of the motion;

(3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or

(4) issue any other appropriate order

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

Though parties must produce evidence in support of and in opposition to a motion for summary judgment, not all types of evidence are permissible. The Sixth Circuit has concurred with the Ninth Circuit that "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). FED. R. CIV. P. 56(e) also has certain, more specific requirements:

[Rule 56(e)] requires that affidavits used for summary judgment purposes be made on the basis of personal knowledge, set forth admissible evidence, and show that the affiant is competent to testify. Rule 56(e) further requires the party to attach sworn or certified copies to all documents referred to in the affidavit. Furthermore, hearsay evidence cannot be considered on a motion for summary judgment.

*Wiley*, 20 F.3d at 225-26 (citations omitted). However, evidence not meeting this standard may be considered by the district court unless the opposing party affirmatively raises the issue of the defect.

> If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived, and [the Sixth Circuit] will review such objections only to avoid a gross miscarriage of justice.

*Id.* at 226 (citations omitted).

As a general matter, the district judge considering a motion for summary judgment is to examine "[o]nly disputes over facts that might affect the outcome of the suit under governing law." *Anderson*, 477 U.S. at 248. The court will not consider non-material facts, nor will it weigh material evidence to determine the truth of the matter. *Id.* at 249. The judge's sole function is to determine whether there is a genuine factual issue for trial; this does not exist unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

In sum, proper summary judgment analysis entails "the threshold inquiry of determining whether there is the need for a trial--whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## Analysis

Browning does not argue, at this stage of the litigation, that it should be granted Summary Judgment on the question of whether it breached the terms of the Supply Agreement. It appears to accept that there is, at least, a genuine question of material fact as to whether a breach occurred, and

whether any such breach was excused under the contract terms. It does argue, however, that FSI has offered no evidence of any recoverable damages that may have resulted from any alleged breach. In Ohio, damages are an essential element of a plaintiff's claim. *See Doner v. Snapp*, 649 N.E.2d 42, 44 (Ohio App. 1994); *see also, Oak Rubber Co. v. Bank One*, N.A., 214 F. Supp. 2d 820 (N.D. Ohio 2002). FSI has articulated three potential calculations for its claimed damages: (1) Owner Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA"); (2) Enterprise Value; and, (3) Outstanding Debt.

In order to prove damages in a breach of contract action in Ohio, a plaintiff must show: (1) that the damages were within the contemplation of the parties at the time the contract was made; (2) that the damages are the probable result of the breach of contract; and, (3) that the damages are not remote and speculative and may be shown with reasonable certainty. *City of Gahanna v. Eastgate Props., Inc.*, 521 N.E.2d 814, 817 (Ohio 1988). Browning contends that the damages sought by FSI fail to satisfy any of these three criteria.

A. <u>Contemplation of the Parties</u>

Browning argues that the damages sought by FSI were not within the contemplation of the parties at the time the contract was made. Rather, Browning asserts that FSI is now seeking consequential and/or incidental damages, including damages in the form of lost profits, which are excluded from the available remedies for a breach of contract under the Asset Purchase Agreement. Section 11.3 of the Asset Purchase Agreement states in relevant part that Browning

> will indemnify, defend (as to third party claims only), protect and hold harmless, [FSI]. . . from and against all Losses that arise as a result of or incident to: ... (b) nonfulfillment or nonperformance of any agreement, covenant or condition on the part of Buyer made in this Agreement or in any other document delivered pursuant to this Agreement, including the Supply Agreement. . . .

(ECF #42-3). "Losses" are defined in Exhibit A of the Asset Purchase Agreement as all

> Liabilities ["debts, liabilities and obligations, whether legal or equitable, accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, foreseen or unforeseen, ordinary or extraordinary, patent or latent, including those arising under any Law... or Action and those arising under any contract agreement, arrangement, commitment or undertaking"], claims, damages, Actions, demands, assessments, adjustments, penalties, losses, costs and expenses whatsoever (including court costs, reasonable attorneys' fees and expenses of investigation but ***excluding incidental, consequential and punitive damages***), whether equitable or legal, matured or contingent, known or unknown, foreseen or unforseen, ordinary or extraordinary, patent or latent.

(ECF #42-3, Ex. A)(emphasis added). Section 11.4.7 reiterates that "[n]o indemnified party shall be entitled to indemnification for incidental, consequential or punitive damages," and clarifies that this includes "damages for business interruption or lost profits," provided that such limitations shall not apply to Third-Party claims. (ECF #42-3).

> As part of this Asset Purchase Agreement, the parties also agreed that
>
> Subject to any equitable remedies in this Agreement and any remedies available in any Related Agreement, the parties acknowledge and agree that their sole and exclusive remedy with respect to any and all claims (other than claims arising from intentional fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any . . . agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement, shall be pursuant to the indemnification provisions set forth in this Article 11... Nothing in this Section 11.9 shall limit any Person's right to seek and obtain any equitable relief to which any Person shall be entitled pursuant to Sections 13.1, 13.2 and 13.4 or otherwise set forth in this Agreement, any remedy in a Related Agreement, or to seek any remedy on account of intentional fraud by any party hereto.

(ECF #42-3, Section 11.9).

In short, the Asset Purchase Agreement provides that Browning will indemnify FSI for any damages sustained as a result of Browning's breach of the Supply Agreement, excluding incidental, consequential and punitive damages. However, the Asset Purchase Agreement also provides that

although this is generally FSI's exclusive remedy for any breach, it is subject to and does not limit any remedies provided to the parties in the Supply Agreement. In other words, any remedy provided in the Supply Agreement is available to FSI for a breach of the Supply Agreement. The Supply Agreement, which is a Related Agreement incorporated into the Asset Purchase Agreement sets forth its own indemnification provision. (ECF #42-3, Ex. A). Within that Agreement, Browning agrees to indemnify FSI

> from any loss, claim, liability, penalty, fine, forfeiture, demand, cause of action, suit and costs incidental thereto, including the cost of defense, settlement and reasonable attorneys' fees... caused by or resulting from (a) any negligent or willful act or omission of [Browning], its agents or employees in connection with this Agreement or resulting from a breach by [Browning] of any of the agreements, representations or warranties of [Browning] contained in this Agreement, or (b) the delivery of Unacceptable Recyclables or Unacceptable Waste by [Browning] to Fultz.

(ECF #42-3, Ex. C, Section 8.1). The Supply Agreement also states that it "sets forth the entire agreement and understanding of the parties hereto with respect to the subject matter of this Agreement and supersedes all arrangements, communications, representations or warranties, whether oral or written, by any officer, employee or representative of either party hereto... There are no restrictions, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein."

The Supply Agreement provides that Browning will indemnify FSI for "any loss" arising from Browning's breach of the Supply Agreement. Loss is not defined, or in any way limited in the Supply Agreement. The parties have not argued that the definition of "Losses" from the Asset Purchase Agreement, which excludes incidental and consequential damages, applies to the Supply

Agreement, and there is nothing in either contract that would suggest that it does.[3] Therefore, as the Asset Purchase Agreement states that all remedies available under the Supply Agreement are available upon a breach of the Supply Agreement, and the Supply Agreement, itself, does not preclude the assessment of incidental and consequential damages, Browning's contention that such damages are precluded by the Agreements is not well taken.

B. <u>Probable Result of the Breach</u>

Browning also argues that the damages sought by FSI were not caused by Browning's alleged breach of contract. Damages are not automatically awarded for a breach of contract. Rather, a plaintiff must demonstrate an actual injury caused by the breach, in order to recover. *Interim Healthcare of N.E. Ohio, Inc. v. Interim Servs., Inc.*, 12 F.Supp. 2d 703 (N.D. Ohio). Recovery for a breach of contract is also limited to the actual loss suffered as a result of the breach. *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 684 N.E.2d 1261, 1266 (Ohio App. 1996); *see also*, *Moriarty v. Equisearch Servs. Inc.*, No. 1:08 CV 2180, 2010 WL 918089, at *6, *8 (N.D. Ohio Mar. 10, 2010)("[D]amages are measured by determining the position that the non-breaching party would have been in 'but for' the breach.").

1. <u>Enterprise Value</u>

FSI has not shown that the full loss of the value of the business can be attributed to Browning's alleged breach of the Supply Agreement. The enterprise value calculated by FSI's expert

---

[3] The Asset Purchase Agreement indicates that "Capitalized terms shall have the meanings assigned to them in [the definition section]." (ECF #42-3, ¶1.1). The word "loss" in the Supply Agreement is not capitalized. Therefore, even if the Court were to apply the Asset Purchase Agreement definitions to terms otherwise undefined in the Supply Agreement, the non-capitalized "loss" would not take on the definition of "Loss" or "Losses" in the Asset Purchase Agreement.

Mr. Ranallo, is not a calculation of the damage incurred at the time of the breach, but rather attempts to value the company at a date three years after FSI went out of business. It attempts to estimate the value a buyer may have placed on the company on September 18, 2018, a date that has no relationship whatsoever to the terms of the Supply Agreement, or the date or details of the alleged breach of that Agreement by Browning. Further, this calculation does not even attempt to assess what FSI would have been worth in the absence of Browning's alleged breach, in order to discern the injury actually caused by the alleged breach.

In addition, the valuation process used by Plaintiff's experts assumes that the Supply Agreement would not only have remained in effect, unchanged, for the stated term, but that it would have been renewed for an additional five year period of time. There is absolutely no legal or factual basis for such an assumption. The Supply Agreement set a single five year term and provided no option for renewal. Even Mr. Ranallo admitted that his valuation would have been completely different if he assumed the Supply Agreement would only have been in effect for the stated five year term, and not subject to another five year renewal. There is nothing in evidence that would connect the proposed enterprise value of FSI to any damages allegedly incurred as a result of Browning's claimed breach of the Supply Agreement. This is, therefore, not a legally supportable theory of damages available to Plaintiff in the current action.

2. Outstanding Debt

FSI's "outstanding debt" theory of damages also fails because there is no evidence that would causally connect the claimed injury to Browning's alleged breach of contract. The debt FSI seeks to recover is debt owed by itself and its landlord, Modolluz. Modolluz is not a party to this action, nor was it a party to the agreement that Browning allegedly breached. FSI has cited no legal

authority that would permit it recover the antecedent debt of a non-party in a breach of contract claim. Further, the debt FSI seeks to recover was not entered into because of the agreement at issue, and FSI was not relying on, nor even anticipating the agreement with Browning when the debt was incurred. FSI admits that the $6 million loan[4] was entered into on the basis of a 2011 MRF model developed by Mr. Skinner prior to its decision to sell the hauling business, and prior to the existence of any agreement between FSI and Browning. (ECF #57 at 17-18).[5] There is no evidence causally linking FSI's (or Modolluz's) outstanding debt to Browning's alleged breach of the Supply Agreement, and FSI may not recover such damages in its breach of contract action. To the extent that FSI is arguing that Browning's alleged breach cost it money that would have been used to pay down the debt, the theory still fails. FSI had not proven that any monies that would have been paid to it absent Browning's alleged breach of the Supply Agreement would have been used to pay down FSI's outstanding debt, nor has it shown that those amounts would have been sufficient to eliminate such debt. The measure of debt incurred by FSI and a third-party, prior to the existence of any agreement with Browning, is not a legitimate measure of damages caused by Browning's later alleged breach of the Supply Agreement.

---

[4] FSI has calculated that there is still $3,152,201.75 outstanding on this loan, and this is the amount it is seeking in damages under the "outstanding debt" theory.

[5] FSI admits that when this model was updated to calculate the impact of Browning's alleged breach of contract, FSI "assumed" that its MRF and recycling center would handle three times as much volume, and "guesstimated" that the total loads of C&D would be about three times mores. Unsupported assumptions and guestimations cannot be the basis for a "reasonably certain" damages calculation.

C. Reasonable Certainty

The Ohio Supreme Court has held that a new business may recover lost profits in a breach of contract action, so long as the amount can be established with reasonable certainty. *AGF, Inc. v. Great Lakes Heat Treating Co.*, 555 N.E.2d 634, 640 (Ohio 1990). In order to satisfy the reasonable certainty requirement for recoverable damages, both the existence and the amount of damages must be demonstrated with reasonable certainty. *Id.* Courts have recognized, however, that determining lost profits will always involve some level of uncertainty or assumptions of future events. *See, Jaynes v. Vetel*, 51 Ohio L.Abs. 202 (1948). At the very least, Plaintiff must provide a reasonable basis for estimating damages to a reasonable, if not absolute, certainty. *See, Quest Workforce Solutions v. Job1USA, Inc.*, 2018-Ohio-3304, 119 N.E.3d 817, 2018 Ohio App. LEXIS 3590. FSI claims that damages exist, and the amounts can be proven using an Owner-EBITDA business valuation. Browning argues that this valuation method is based on speculative projections and random guesses and is not supported by any factual foundation. Further, Browning argues that none of the experts hired by FSI to assess a value under this theory assessed whether the valuation amounts could be used to measure the damages caused by Browning's alleged breach of the Supply Agreement.

FSI seeks five years worth of Owner-EBITDA, for a projected total of $7,450,340.12. This number is based on a calculation made by FSI's purported expert, Mr. Skinner. FSI hired a "geomapping expert" to plot the locations of every address from Browning's hauling records from 2015 to 2016 (after the Supply Agreement took effect), broken down by the type of waste (i.e. C&D, MSW, OCC, or SSR). These numbers include waste that was brought to FSI under the terms of the Supply Agreement from February to August, prior to the alleged breach. The number that was

provided to Mr. Skinner by the geomapping expert was based on a combined amount of C&D tonnages and MSW tonnages. This combined C&D tonnage and MSW tonnage was added, and reduced by a certain percentage, then treated as the total amount of C&D tonnage that should have been brought to FSI during the course of the Supply Agreement. Skinner's valuation also included tonnage projections for SSR and OCC resale.[6]

Browning argues that the MSW tonnage should not have been included in the calculation, because MSW waste was not a part of the waste that it was obligated to deliver to FSI under the terms of the Supply Agreement. FSI claims that the MSW numbers considered in the calculation included loads that had a mix of C&D waste and MSW, and that such loads were required to be delivered under the terms of the contract. The Contract requires delivery of "all loads *that contain C&D Waste within the Territory.*" (ECF #1-1, Recital E)(emphasis added). C&D waste is defined as "any and all waste that is not Unacceptable Waste, resulting from the construction, remodeling, clean-up and demolition operations on houses, commercial and industrial buildings and other structures." (ECF #1-1, ¶ 1.2). "Unacceptable Waste" is defined as waste that cannot be accepted at either FSI's facility or the Landfill. (ECF #1-1, ¶1.15). MSW is defined as "any waste generated from any source that is contaminated with putrescible materials that is not "Unacceptable Waste." (ECF #1-1, ¶ 1.9). Based on these definitions, C&D waste could be contained in an MSW load. The Supply Agreement further contemplates that after retraction of the useful portions of a delivered load, there may be residual waste that does not contain C&D, industrial waste, OCC, or SSR. That waste would be considered "residual" and, under the terms of the agreement would be delivered back to

---

[6] This amounts to approximately half of the total revenues used in Skinner's calculation of the EBITDA valuation.

Browning for disposal at the landfill, for a set fee, to be paid by FSI. If C&D is contained in an MSW load, it is required to be delivered to FSI under Recital E of the Supply Agreement, after retraction, FSI would return the residual waste to Browning for landfill disposal.[7] Therefore, Browning's argument that no MSW loads could be relevant in calculating FSI's alleged damages, is not well taken. Whether the amount of MSW that FSI claims contained C&D is supported is a question of fact that is better left for trial.

There are many potential problems with the calculations provided by FSI in support of its Owner-EBITDA theory of damages. For example, after arriving at a projected, combined tonnage and revenue forecast for the year 2015-2016, Mr. Skinner applied a 2.5% growth rate for the tonnage forecast, and a 3% resale revue forecast for year from 2017-2019. He provided no factual basis for how these growth rate percentages were chosen, but relied on the opinion of a person "with knowledge and experience in this area," and the global growth rate of Browning's parent company, whose income is not limited to revenue obtained through recycling streams. He did not appear to have considered FSI's historical growth, the actual price index for recyclable commodities, or FSI's historical experience. His final valuation also included over $2.5 million in Owner Compensation Addbacks. It is unclear from the evidence presented whether including Owner Compensation Addbacks artificially inflates the valuation, as these appear to represent income actually received, and

---

[7] Section 5.7 states that "[d]uring the Term, except as provided in this Agreement with respect to Residuals, Fultz agrees not to accept Municipal Solid Waste from any generator at the MRF facility." As set forth above, MSW loads that contain C&D would trigger the "except as provided in this Agreement" exception to this provision. The section would clearly prohibit Fultz from accepting MSW loads that did not include C&D, dry industrial, OCC or SSR waste from Browning, and arguably even mixed loads from any provider other than Browning.

not income lost as a result of any alleged breach. Further, the valuation provided is based in part on the growth rates of a business that is not reasonably comparable to FSI's newly established company.

Within the information provided, however, the components for a reliable damages calculation may be present. FSI's experts have identified Browning's hauled tonnages for 2015-2016 for the actual C&D waste that is covered by the Supply Agreement, and for which FSI is seeking damages. They have provided a witness who has estimated the potential C&D matter contained in other MSW loads within the Territory. The validity of the five year growth rates, as well as the recovery rate for C&D materials, and the likely make-up of the MSW waste considered, all of which are assumed in the calculation will be at least partly dependent on the credibility assigned to the experts familiar with the industry and its general growth patterns. Therefore, although the amount currently requested under this theory may not be fully supported by the evidence presented, there is sufficient evidence that would, subject to witness credibility determinations, permit the Court to find some amount of damages resulting from Browning's alleged breach of the Supply Agreement.

**Conclusion**

For the reasons set forth above, Defendant's motions for summary judgment is GRANTED in so far as Plaintiff is seeking recovery of damages under the Enterprise Valuation or Outstanding Debt theories set forth in their briefing. It is DENIED in all other respects. Trial remains set for September 23, 2019 at 8:30 a.m.. [8]

_/s/ Donald C. Nugent_
DONALD C. NUGENT
United States District Judge

DATED: July 12, 2019

---

[8] Although the docket indicates that FSI has requested a jury trial, the Asset Purchase Agreement precludes trial by jury for disputes arising out of or in any way related to the Agreeement. (ECF #42-3, §14.1 (d), (e). The Court does, however, intend to seat an advisory jury pursuant to Fed. R. Civ. P. 39 (c). A trial order will issue.